**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHELLE HUGHES,<br>Plaintiff,<br>v.<br>WAL-MART ASSOCIATES, INC., et al.,<br>Defendants. | Case No. 1:23-cv-00949 JLT FJS<br>ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT<br>(Doc. 40) |

Michelle Hughes alleges that she was fired from a managerial position at a California Walmart store in retaliation for making internal complaints and because of her gender and heritage. The defendant, Wal-Mart Associates, Inc., contends that she was discharged for the simple reason that she was not doing her job. It moves for summary judgment. (Doc. 40.) As explained in this order, genuine disputes of material fact remain unresolved. The motion is **DENIED** for the most part. The exception is Hughes's request for punitive damages. Walmart has demonstrated that she cannot obtain punitive damages at trial. Its motion is **GRANTED IN PART** to that extent.

**EVIDENCE AND OBJECTIONS**

Under the familiar standard of Rule 56, Walmart's motion can be granted only if it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making its case, it must cite "particular parts of

materials in the record," as must Hughes in opposition. Fed. R. Civ. P. 56(c)(1)(A).

Hughes and Walmart have both cited the evidentiary record to support their positions. They have also objected that many parts of that record would be inadmissible at trial. Rule 56 permits them to do this. *See* Fed. R. Civ. P. 56(c)(2). But district courts have often warned that objections can be unproductive at the summary judgment stage. *City of Lincoln v. County of Placer*, 668 F. Supp. 3d 1079, 1086 (E.D. Cal. 2023) (collecting authority). That is particularly true of "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." *Doe v. Starbucks, Inc.*, No. 08-0582, 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009). Many of Hughes's and Walmart's evidentiary objections fit this description. The Court will not "attempt to fill in the legal arguments and citations" on their behalf. *City of Lincoln*, 668 F. Supp. 3d at 1087. Their perfunctory objections are overruled summarily.

As courts have also emphasized, "a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001). "This standard makes some evidentiary objections a poor fit for summary judgment," especially objections based on form, relevance, vagueness, speculation, and similar theories. *City of Lincoln*, 668 F. Supp. 3d at 1086. To that end, the Court has disregarded objections that either duplicate or conflict with the summary judgment standard.

For the parties' remaining objections, the Court has reviewed the cited documents, transcripts, and other records. For each portion of the record that is cited below, the Court has determined that the evidence either would be admissible for the specified purpose or could likely be reduced to an admissible form at trial. *See, e.g.*, *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). The summary in the next section is a review of that evidence, portrayed in the light most favorable to Hughes, as the party who opposes summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**BACKGROUND**

Hughes began working as a cashier at Walmart in 1995. (Docs. 42-2 at 4; 43-1 at 3.)

Over the next twenty-six years or so, she worked her way into increasingly senior positions. (*Id.*) She did not think of her work at Walmart as her "job," but rather as her "career." (Doc. 42-1 at 208.) She even aspired to move to Arkansas and work in the company's home office. (*Id.*)

In 2019, Hughes was promoted to "general merchandise coach" or "GM Coach" in a store in Porterville, California. (Doc. 40-4 at 5.) She was responsible for training and managing teams of lower-level supervisors and store employees in twenty-two different departments. (*See* Doc. 42-2 at 5.) She was also responsible for ensuring that those departments were clean, organized, properly priced, and ready for customers. (Docs. 42-2 at 5; 40-4 at 74.) This was more responsibility than other GM Coaches had. (*See* Doc. 42-1 at 209.) Hughes knew, for example, of a GM Coach in another store who was responsible for only seven departments, and another who was responsible for just two. (*Id.*)

Walmart terminated Hughes from her job as GM Coach in June 2022, after about three years. (Doc. 42-1 at 212.) This case is a dispute about why. She argues it was a combination of discriminatory and retaliatory reasons. Walmart attributes its decision to her job performance.

Hughes describes several events over the years between 2019 and 2022 to explain why she saw the termination as discriminatory and retaliatory. The first was in late 2020. (*See* Doc. 42-1 at 208.) Two employees, both men, were arguing with a customer whose car was in the store's auto shop. (*See id.* at 25.) Their direct supervisor, a man named Jose Gonzalez, was not in the store at the time, so Hughes stepped in. (*See id.*) She told the two employees to go back to the office so she could help the customer. (*Id.*)

Later, when Gonzalez was in the store again, Hughes went to find him to discuss what had happened. The two shop employees were already talking to him. (*See id.* at 25–26.) They were criticizing her, telling Gonzalez that she should have left them alone. (*See id.*) In response, Gonzalez said, "Well, she's just a bitch anyway," referring to Hughes—who was standing right there—and he told the two shop employees that they did not have to listen to her because she was not their boss. (*Id.* at 26.) The men all laughed. (*See id.* at 25.)

To be clear, Hughes was indeed their boss, and Gonzalez, the man who had just called her a "bitch," was her inferior, too. (*See id.* at 26.) She later confronted him in private. (*See id.*) She

told him that he had acted inappropriately and that he should never have told his employees not to listen to her, let alone to call her a "bitch." (*Id.*) But Gonzalez just brushed her off. He said the two men worked for him, not her, and he would do what he wanted. (*See id.* at 26.) Hughes's own superior, the store manager, was no help to her. When she explained to him what had happened, he shrugged. (*See id.*) "Things like that happen," he told her. (*See id.* at 208–09.) In her deposition, Hughes said that this was "very belittling." (*Id.* at 26.) She was supposedly responsible for her departments and what happened in them, "and then I just have to be talked to like that." (*Id.*)

The poor relationship between Hughes and Gonzalez appears not to have improved as time went on, and no evidence in the parties' filings shows someone corrected the problem. About a year later, in August 2021, Hughes thought things were bad enough that she decided to file an ethics complaint about Gonzalez's hostility and combative attitude. (*See* Doc. 42-2 at 41.) The ethics department informed her that it was not an ethical problem. (*Id.*) Again the next year, in April 2022, Hughes again raised concerns about Gonzalez with the store manager, including in complaints about how he raised his voice with her and was still upset about how she was handling his team in his absence. (*See id.* at 45, 56.) No evidence shows the store manager addressed her complaint effectively.

Several other troubling episodes involved a different man, Francisco Medina, who was filling in temporarily as store manager in the summer of 2021. Sometimes he spoke only in Spanish during work meetings, even though it was obvious that Hughes and another employee named Shelby Tate could not understand Spanish. (Docs. 40-8 at 6; 42-1 at 209; 42-2 at 39.) Medina also once asked Tate, a Black man, if he could arrange for his "friends" to steal a DVD rental machine from the front of the store, and in a meeting, he also once singled Tate out and asked the other employees to raise their hands if they did not like him. (*See* Doc. 42-1 at 139–40, 157, 209–10.) Hughes also remembers that Medina required some new employees to work without pay, delayed their first paychecks, and hired some people without first processing their work authorization documents. (*See* Docs. 42-1 at 210; 42-2 at 35–36.) She was similarly troubled by his disrespectful comments about a human resources manager (*see* Doc. 42-2 at 35–

36), she worried that he was violating federal law by storing alcohol in the pharmacy (*see* 42-2 at 40), and she later told a different store manager that he had treated her and other women differently than men (Doc. 42-1 at 116–17).

Hughes brought Medina's conduct to the company's attention using its internal reporting system. (*See* Doc. 42-1 at 167, 209–10; 42-2 at 35–36, 39–40.) She did not receive responses to her reports and no one interviewed her, so from her perspective, Walmart seemed not to be taking any corrective action. (*See id.*) Walmart has submitted records showing that it decided these incidents were not ethics issues or legal problems and should be handled at the store level as personnel matters, if at all. (*See* Doc. 42-2 at 35–36, 40–41.) In any event, Medina's behavior does not appear to have come under meaningful scrutiny. In fact, after Hughes alerted the company to her concerns about Medina, he told her that he got his job because he had his coworkers' backs, and he said that Hughes should do the same if she wanted to go somewhere in the company. (Doc. 42-1 at 210.) To Hughes, the implication was clear: don't report on me or anyone else if you want a promotion. (*See id.*) She heard the same from others: promotions don't come to those who complain. (*See id.*)

Hughes remembers another incident in March 2022, this time involving a man named Juan Herrera, who was the asset protection manager. (*See* Doc. 42-1 at 210.) Hughes was counting inventory in the optical department with another employee, Carl Smith. (Doc. 42-1 at 255.) It seemed to Hughes and Smith that several thousand dollars of eyeglasses were missing. (*See id.* at 210.) Herrera told Hughes and Smith to just "write that the glasses are there." (*Id.*) "I'm sure they'll pop up," he said. (*Id.*) This was concerning to Hughes because she thought that reporting false inventories was illegal. (*See id.*)

Hughes and Smith did not falsify their count. Instead, she filed an internal complaint. (*See id.*) Walmart would argue at trial that it "thoroughly investigated" this complaint and concluded that her allegations were "unsubstantiated." (Doc. 42-2 at 42.) What it means by this assertion is unclear. The company does not claim to have discredited Hughes's account of what happened. It does not claim to have disproven Hughes's claim about what Herrera said. It does not cite evidence to show that Herrera was reprimanded or that someone took steps to prevent

him from giving similar instructions to someone else in the future. Instead, the company seems only to have satisfied itself that Herrera could not have modified the inventory count after the fact, after Hughes and Smith refused. (*See id.*)

Beyond these more specific events, Hughes says that often she had the feeling that she was an outsider in the eyes of her coworkers and superiors. Most employees in the store were Hispanic. (Doc. 42-1 at 132.) Most of the supervisors and managers were men. (*See id.* at 208.) She felt like they were blind to her work ethic, dismissive of her efforts, and thought their own work was more difficult and more important than hers. (*See* Doc. 40-4 at 101–02.) The men in the store would often go out to drink together after work, then call in "sick" the next day because they were hungover. (*See* Doc. 42-1 at 225–26.) Hughes's male supervisor would excuse these absences and assign her their work, which she would finish after hours. (*See id.*) She also remembers how a male supervisor had a habit of interrupting the meetings she was conducting, laughing and joking with the men under her supervision, then leaving with them, knowing she would do their work while they were gone. (*See id.* at 60.) When she asked him not to do this, he cursed at her and told her that he would fire her if she said anything more about it. (*See id.*) And finally, she remembers two occasions on which less qualified men were put ahead of her in line for promotions. (*See* Doc. 42-1 at 209.)

Walmart argues for its part that Hughes was not fired for any discriminatory or retaliatory reasons, but instead because of her poor job performance. The company has a color-coded, three-level "disciplinary action policy" that moves from yellow to orange to red. (*See* Doc. 42-2 at 17.) That policy applies to all store employees, including coaches and managers like Hughes. (*Id.*) The first disciplinary action in Hughes's file—her "yellow" warning—is from February 2021. (*See id.*) The store manager gave notice to Hughes that she had exhibited "poor business judgment." (*Id.*) "On numerous occasions," the store manager wrote, Hughes had been "assigned projects for her areas, given associates to complete the projects, yet failed to validate associates' work or ensure progress was being made." (*Id.* at 17–18.) This had led to "poor productivity" and had set "the entire workflow behind." (*Id.* at 18.)

Hughes explained her understanding of what happened in her deposition. It was, by her

telling, really just about a single incident. The store did not have an asset protection manager at the time, but an asset protection executive was scheduled to visit the store. (*See* Doc. 42-1 at 233.) Hughes had experience in asset protection, so she took on the extra responsibility of preparing for his visit. (*See id.*) This took all day. (*Id.*) In the meantime, the team leaders she ordinarily supervised had their own work to do in the apparel section of the store, but they were working with outdated floor plans, so they got a few things wrong. (*See id.*) The store manager was upset that night when she walked through the apparel department, and Hughes took responsibility for her team leaders' mistakes. (*See id.*) Her step-one "yellow" write-up was the result. (*See id.*)

The next disciplinary note in her file is less formal—just an email. It came a few months later. A temporary store manager named Stephen DeGrasse was filling in for the permanent manager, who was taking a leave of absence. (Doc. 42-2 at 8, 17–18.) DeGrasse emailed an executive in November 2021 to report that Hughes's "area of responsibilities [were] below standard." (*Id.* at 18–19.) He cited her poor training of the team leaders under her supervision, a lack of overall cleanliness, low morale, and problems with "customer engagement." (*Id.* at 19–20.) This assessment seemed to have caught Hughes off guard. She testified in her deposition that DeGrasse had never walked through her departments with her, had not pointed out any problems to her, and had not asked her to fix anything. (Doc. 42-1 at 113–14.) She would claim at trial that his criticisms were invented; she suspects that he wanted a promotion and was making these criticisms in an effort to appear more impressive to his own superiors. (*See id.*) His email did not lead to any formal discipline in any event. Temporary store managers do not have authority to issue formal discipline. (*See* Doc. 42-2 at 18–19.) Hughes's evaluations from this time also showed that she was successful and meeting expectations. (Docs. 42-1 at 223; Doc. 42-2 at 20.)

The next disciplinary action was the second formal disciplinary action in Hughes's file and the one at the "orange" level. (*See* Doc. 42-1 at 211; 42-2 at 20–21.) In April 2022, she "was reprimanded for consistently failing to keep her store areas clean." (Doc. 40-8 at 7.) The report cites dead plants and missing price tags in the garden department, along with missing "fact tags"

on bike racks, among other similar things. (*See* Doc. 42-1 at 204–05.)

Hughes testified in her deposition that the store manager at the time, a woman named Angelica Baeza, was demanding more of her than she and her team leaders could give. She said that a few weeks earlier, Baeza had asked her to work the overnight shift on a temporary basis. (*See* Docs. 42-1 at 211, 240; 42-2 at 31.) This was because the store was receiving "a substantial amount of general merchandise freight" overnight at the time. (*See* Doc. 42-2 at 31.) Hughes remembers Baeza reassuring her that she would "take care" of the parts of the store that Hughes was ordinarily responsible for during the daytime hours. (Doc. 42-1 at 236.) Although the evidence on this issue is ambiguous, it seems as though Baeza did not live up to her promise. The cleanliness and labeling problems that ultimately led to Hughes's second disciplinary action cropped up during the daytime, while she was working the overnight shift. (*See id.* at 204, 211.) To complicate matters further, an executive was again visiting the store, and between the meetings and training sessions, Hughes and her team leaders had little time to clean and organize their departments. (*See id.* at 204.)

The third, "red" disciplinary action came in May 2022. (*See* Docs. 42-1 at 211; 42-2 at 25.) Baeza learned about a problem from the store's asset protection manager, Juan Herrera, who a few months earlier had asked Hughes and Smith to report falsely that no eyeglasses were missing. (Docs. 42-1 at 73–74, 211; 42-2 at 24, 27.) He told Baeza that no one had audited the store's inventory of wireless devices over the past four weeks. (*See id.*) Employees should have been conducting these audits regularly during the day, when Hughes was not there. (Docs. 42-1 at 211; 42-2 at 27, 74.) To be clear, it was not Hughes's responsibility to perform the audits or complete any audit reports herself; Baeza expected her to notice that something was wrong and to follow up with the employees and team leaders who were (or should have been) conducting those audits during the day. (*See* Doc. 42-1 at 115.)

Hughes suspects that Baeza and Herrera were setting her up to fail. Baeza did not discipline the employees who should have been performing the missing audits or reports, asset protection employees, or anyone else who was in the store during the daytime hours when the reports and audits should have been created. Only Hughes was disciplined. (*Id.* at 113.) The

missing audits also caught Hughes by surprise. No one told her that there was a problem. (*Id.* at 109, 211.) At least two other employees thought this was unusual or odd. (*See id.* at 127, 169–70.) Shelby Tate, for example, thought that Hughes should have received reports that something was wrong within a day or two. (*See id.* at 127.) Baeza had also begun to reassign employees away from Hughes's areas of the store and to ask other employees what kind of leader Hughes was. (*Id.* at 211.) She even asked two people to "write statements stating that they could not do their jobs under [Hughes's] leadership." (*Id.*) They refused. (*Id.*) At trial, Hughes would also offer her own and Tate's testimony that Herrera had connections in the ethics office, that he was close friends with Baeza, and that he wanted to retaliate against Hughes for filing an ethics complaint against him. (*See* Docs. 42-1 at 124–26, 239; 43-1 at 35, 152–55.)

Hughes was terminated about a month after she received her "red" disciplinary notice. (*See id.* at 212.) Baeza told her it was because she had failed to keep her departments clean and organized. (*See id.* at 211.) In Hughes's telling, Baeza was again the reason for these problems. The employees she pulled from Hughes's departments were the people who would have helped to keep the store clean and organized. (*See id.*) Hughes would also testify that some of Baeza's claims were simply false. (*See id.* at 211–12.)

On the whole, Hughes believes the claims about her poor performance were a pretext. She notes among other things that termination is not the only option after a third disciplinary notice. (*See* Doc. 43-1 at 35.) Hughes knows of two people who kept their jobs after a third notice, and they were both Hispanic men. (Doc. 42-1 at 212.) A Hispanic man also took over her job after she was fired, but rather than managing the same twenty-two departments, he was assigned responsibility for only seven. (*Id.*) And after she was fired, an executive told other Walmart employees to congratulate Baeza "on getting rid of a 25-and-a-half-year associate." (*Id.* at 78.) Hughes also emphasizes the timing of her termination, noting that she was fired after she continued making formal and informal ethical and personnel complaints against her Hispanic male supervisors and coworkers. She also cites Shelby Tate's similar experience: he was terminated at about the same time, and also soon after he made ethical complaints against Baeza and Herrera. (*See* Docs. 42-1 at 124–26, 239; 43-1 at 35, 152–55.)

Hughes filed this lawsuit in state court against Walmart in 2023, and the company removed the case to this court under the federal diversity jurisdiction statute. (*See* Docs. 1, 1-1.) Hughes's legal claims all arise under California law. She claims she was terminated in violation of state laws that prohibit retaliation against employees who report illegal or discriminatory conduct. (*See* Doc. 36 at 8–11, 19–20.) She also alleges Walmart discriminated against her based on her sex or gender, national origin, and race, and she alleges similarly that it did not prevent discrimination. (*See id.* at 11–19.) Finally, she alleges her termination was wrongful under common law protections against dismissals in violation of public policy. (*See id.* at 20–23.) She seeks damages (including punitive damages), prejudgment interest, an award of costs and attorneys' fees, and equitable relief. (*See id.* at 24.)

## DISCUSSION

As may be apparent from the summary above, the competing evidence that Hughes and Walmart have marshalled leaves genuine disputes of material fact unresolved. Those disputes are easiest to see in connection with Hughes's discrimination claims, so those claims are the most natural place to start.

### I. Discrimination

The Fair Employment and Housing Act prohibits discrimination "because of" sex, gender, race, and national origin, among other characteristics. *See* Cal. Gov't Code § 12940(a). The California Supreme Court has "adopted the three-stage burden-shifting test established by *McDonnell Douglas Corp. v. Green*" for trying cases about this prohibition. *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 214 (2013) (citing 411 U.S. 792 (1973)). At trial, A plaintiff must first "make a prima facie case of discrimination by showing that it is more likely than not that the employer has taken an adverse employment action based on a prohibited criterion." *Id.* The employer can then respond with "evidence that its action was taken for a legitimate, nondiscriminatory reason." *Id.* Finally, the employee can prevail by showing "that the employer's proffered nondiscriminatory reason was actually a pretext for discrimination." *Id.*

When an employer moves for summary judgment in a discrimination case, these evidentiary burdens are effectively "reversed." *Dep't of Fair Emp. & Hous. v. Lucent Techs.,*

*Inc.*, 642 F.3d 728, 745 (9th Cir. 2011) (quoting *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 224 (1999)). For example, an employer might argue—as Walmart does in this case—that an allegedly discriminatory termination was not actually based on the employee's gender, sex, heritage, or any other protected characteristics. It would be the employee's burden to prove her prima facie case at trial, including that the termination was discriminatory, so it would be for the employer to prove at summary judgment that the employee could not carry that burden at trial. *See id.* By contrast, it would be the employer's burden to come forward with evidence showing that it had a legitimate, nondiscriminatory reason for terminating the plaintiff. *See Harris*, 56 Cal. 4th at 214. At summary judgment, then, the employer would need to support its motion with both the legitimate, nondiscriminatory reasons and the evidence that it would offer at trial. *See Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1146–47 (9th Cir. 2017); *Dep't of Fair Emp. & Hous.*, 642 F.3d at 745. It would be the employee's burden to prove at trial that this explanation is not to be believed, *see Harris*, 56 Cal. 4th at 214, so at summary judgment, it would be up to the employer to demonstrate that no reasonable factfinder could reject the employer's explanation at trial, although it would be up to the employee to identify the evidence that would support her position at trial. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000); *Dep't of Fair Emp. & Hous.*, 642 F.3d at 745.

In practice, these rules boil down to two questions: (1) Has the employer demonstrated that the plaintiff "could not establish" one or more of the elements of her prima facie case at trial? (2) Or has the employer established beyond dispute that "there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment"? *Dep't of Fair Emp. & Hous.*, 642 F.3d at 745 (quoting *Avila v. Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237, 1247 (2008)). If the answer to either question is "yes," the employer is entitled to summary judgment. *See id.* If the answer to both questions is "no," then the case proceeds to trial. *See id.*

On Hughes's prima facie case, the parties agree that she could show she is within one or more protected classes based on her sex, gender, race, and heritage and that the company took an "adverse employment action" by discharging her. (*See* Doc. 40-1 at 21.) Walmart's motion focuses on the other parts of her prima facie case: it contends that she could not show that she was

performing competently, nor that the circumstances were suggestive of a discriminatory motive. (*See id.* at 21–24.)

California courts have made clear that the basic elements of a plaintiff's prima facie case act as a relatively wide filter. They were designed to eliminate only "the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000). An employee's burden at trial is, for that reason, not on "onerous" one. *Id.* at 355 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). Hughes has cited evidence that could permit her case to pass through this filter. She has cited evidence to that could show that she was often one of very few non-Hispanic women in a management position, if not the only such person. She could also offer evidence that she had more responsibility that her male peers and was more conscientious and dependable. The record could also permit a factfinder to conclude that she was repeatedly subjected to poor, demeaning, and unfair treatment by the Hispanic men around her, both from her superiors and her inferiors, and that her complaints and requests for help did not result in any meaningful changes. Her testimony would also be that the company twice passed her over for a potential promotion in favor of less qualified Hispanic men, and that after she was discharged, she was replaced by a Hispanic man who took on less responsibility than she had handled. Her discrimination claims are not "plainly meritless." *Guz*, 24 Cla. 4th at 354.

With that said, Walmart has cited evidence that would support its argument that Hughes was discharged for legitimate reasons that had nothing to do with her sex, gender, race, or heritage. It has documented her history of multiple disciplinary notices based on a lack of cleanliness and organization and ineffective supervision. A jury could credit this evidence. It may very well agree with Walmart that Hughes was discharged because of her performance on the job. But that is not the only reasonable conclusion that a jury could draw from the evidence, at least not as it currently stands. Hughes has cited portions of the record that could show her discharge was effectively a foregone conclusion, the inevitable result of a bias against her and her failure to meet impossible expectations—in a word, a pretext.

Jurors could credit, for example, her testimony that her "yellow" disciplinary notice was

unwarranted and came about because she had agreed to take on an additional responsibility and refused to pass the blame to her teams. Jurors could also accept her testimony that her "orange" disciplinary notice was the unjust consequence of her agreement to help her store manager by switching to the overnight shift. She has also cited evidence that could show that while she was away, the store manager was specifically (and unsuccessfully) soliciting criticisms of her, suggesting that others were looking for reasons to oust her. She would explain as well at trial that the store manager essentially sprung the "red" disciplinary notice upon her after others inexplicably allowed the underlying problem to fester. And finally, she has cited evidence that could show that a termination was not the only option Walmart had, or even the most sensible. She had secured several promotions in succession over the two previous decades. Walmart's decision to terminate her—rather than, say, to reassign her to one of the jobs she had done so well in the past—could reasonably be attributed to an irrational animus. To that end, Hughes could likely present the jury with evidence to show that her superiors congratulated the store manager for securing her termination.

This evidence would add a further layer over the evidence Hughes offered in making her prima facie case. Reasonable jurors could interpret this evidence as altogether demonstrating that the performance problems were just an excuse. There was, for example, the poor treatment she received from her Hispanic male superiors and inferiors—who sometimes threatened her, cursed at her, left their work for her, warned her not to complain, and spoke in Spanish even when it was obvious that she did not understand. And there was the absence of any evidence her complaints and requests for help resulted in any changes.

But again, this is not the final word on the matter. Hughes might not prove her claims to a factfinder's satisfaction at trial. Walmart's theory may be more likely to win out at the end of the day, given the written documentation that it has produced and cited. But for now, that is not the question. Walmart has not demonstrated that there are no genuine disputes of any material fact, nor that it is entitled to judgment as a matter of law on Hughes's discrimination claims. Its motion is denied in this respect.

\\\\\

**I. Retaliation**

The Fair Employment and Housing Act also prohibits discrimination "against any person because the person has opposed any practices" that the Act prohibits. Cal. Gov't Code § 12940(h). Hughes alleges her discharge violated this provision as well. California Courts use the same three-step burden-shifting test to try claims of retaliatory discharge. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). To make out a prima facie case of retaliation at trial, plaintiffs must show that they engaged in a "protected activity," that they were subjected to an "adverse employment action," and that there was "a causal link between the protected activity and the employer's actions." *Id.* (citations and quotation marks omitted). The employer can then offer evidence to show it had a legitimate, nonretaliatory reason for its actions, and the employee can respond by proving the employer's explanation is not to be believed. *Id.*

Hughes cites two of her internal complaints to show she engaged in a "protected activity": (1) that she raised concerns about how Medina spoke Spanish in some meetings even though she and Tate did not, and (2) that she alerted the company to Medina's comment about the propensity of Tate's "friends" to commit a theft. (*See* Doc. 42 at 27.) Walmart would contend at trial that Hughes did not bring these issues to the company's attention effectively or at all (*see* Doc. 40-1 at 25–26), but the Court must assume for now that she did. Walmart concedes that a termination is an "adverse employment action" (*id.* at 21), and it contends only briefly, without citations or analysis, that there is no "causal link" between the reports and her termination (*id.* at 26). It has not demonstrated beyond dispute that Hughes cannot make out a prima facie case of retaliation.

As for the second and third parts of the burden-shifting test, Walmart contends that Hughes could not offer evidence to overcome its nonretaliatory explanation for her discharge, as it did in connection with her discrimination claim. (*See id.* at 26–27.) These arguments fall short for largely the same reasons above, based on essentially the same conflicts in the evidentiary record. Hughes has cited evidence that a jury could rely on to conclude that the disciplinary notices were a pretext for an unstated an improper purpose: from her testimony about how a store manager once told her that she would not be promoted if she complained to Herrera's claims that Baeza would take care of any complaints against him. Hughes could also again rely on

arguments about the harshness of the discipline she faced, including the company's decision to discharge her rather than to reassign her to a position where she had performed well for many years. Walmart's motion is also denied in this respect.

**II. Whistleblower Protection**

Hughes also asserts a claim under section 1102.5(b) of the state's Labor Code. The state supreme court has described that section as "encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." *People ex rel. Garcia-Brower v. Kolla's, Inc.*, 14 Cal. 5th 719, 723 (2023) (quoting *Green v. Ralee Engineering Co.*, 19 Cal. 4th 66, 66 (1998)). Employees may file private suits for damages based on violations of section 1102.5. *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 709 (2022) (citing Cal. Lab. Code § 1105). To show that an employer violated section 1102.5(b), employees must prove they had "reasonable cause to believe" that the reported information disclosed "a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Cal. Lab. Code § 1102.5(b). Because the statute requires this "reasonable cause to believe," it "does not protect employees who do not believe or who unreasonably believe that the information they are disclosing shows a violation of the law." *Garcia-Brower*, 14 Cal. 5th at 731. And because the statute refers to violations of statutes, rules, and regulations, it "excludes from whistleblower protection disclosures that involve only disagreements over discretionary decisions, policy choices, interpersonal dynamics, or other nonactionable issues." *Id.* at 734.

Walmart argues that Hughes had no reasonable cause to believe that she was disclosing violations of any laws, rules, or regulations. At most, the company argues, she was expressing her concern about interpersonal conflicts and behavior that violated the company's own policies and procedures. (*See* Doc. 40-1 at 17–18.) Hughes argues in opposition that her reports were related to three legal prohibitions. (Doc. 42 at 20–22.)

First, Hughes cites her reports about Medina, the temporary store manager. She argues she reported information about him that disclosed violations of California's Fair Employment and Housing Act. (*Id.* at 20.) As summarized above, that law prohibits discrimination "in compensation or in terms, conditions, or privileges of employment" because of "race," "national

origin," or "ancestry." Cal. Gov't Code § 12940(a). It also makes it unlawful "to harass an employee" because of the employee's "race," "national origin," or "ancestry." *Id.* § 12940(j)(1). Hughes reported that Medina spoke only Spanish during some staff meetings, even though she and Tate did not speak Spanish. Hughes also reported that Medina had made an insulting comment to Tate about his "friends" and their willingness to commit a theft, and she reported that Medina had invited other employees to openly express their dislike for Tate. A jury could decide that these circumstances gave Hughes "reasonable cause" to believe that she was reporting unlawful harassment or discrimination based on race, national origin, or ancestry, even if, in the end, that belief was wrong. These questions are notoriously sensitive and difficult to answer, even for experienced lawyers and judges, especially at summary judgment. *See, e.g.*, *Bailey v. S.F. Dist. Attorney's Off.*, 16 Cal. 5th 611, 628–35 (2024) (discussing and applying relevant legal standards in a case of alleged racial hostility in the workplace).

Second, Hughes cites her complaint that Medina had required new employees to work without pay or delayed their paychecks. She argues that it was reasonable to believe that she was reporting a violation of the state's Labor Code. (*See* Doc. 42 at 20.) The California Labor Code provides that wages are generally "due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays." Cal. Lab. Code § 204(a). Hughes's understanding that Medina had delayed new employees' paychecks gave her reasonable cause to believe that the company was violating the timelines in section 204(a).

Third, Hughes argues that she had reasonable cause to believe that when she warned about Herrera's instruction to falsify the eyeglasses inventory count, she was disclosing a violation of the federal Securities Exchange Act and the Securities and Exchange Commission's implementing regulations. (*See* Doc. 42 at 21.) She cites section 10(b) of the Exchange Act, which makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules of regulations as the [SEC] may prescribe." 33 U.S.C. § 78j(b). The rule the SEC adopted is Rule 10b-5, which makes it "unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

Hughes believed that Walmart had an obligation to report its inventory accurately in its financial disclosures. (Doc. 42-1 at 210.) She cites the company's code of conduct, which refers to Walmart as a "publicly traded company" with "legal obligations" to keep "clear, accurate, timely, and complete" records. (*Id.* at 208.) This evidence does not support her position. She could not show at trial that any inventory numbers were actually falsified. She claims they were not. Nor is it possible to infer that any false counts were at risk of becoming a part of any public financial disclosures, nor that a few thousand dollars in missing eyeglasses would have made for a materially false or misleading financial statement from the perspective of a Walmart investor. *See E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928–46 (9th Cir. 2023) (discussing and applying the relevant legal standard). At most, Hughes's complaint raised concerns about the types of "policy choices" and "interpersonal dynamics" that cannot support a claim under section 1102.5(b). *Garcia-Brower*, 14 Cal. 5th at 734. It would likely have been reasonable for her to think that Herrera was violating the company's code of conduct, in other words, but not the federal laws and regulations that prohibit frauds in a publicly traded company's disclosures to its investors.

An employee can prove retaliation in violation of section 1102.5(b) by showing by a preponderance of the evidence that their report "was a contributing factor" to the employer's decision. Cal. Lab. Code § 1102.6. "This means plaintiffs may satisfy their burden of proving unlawful retaliation even when other, legitimate factors also contributed to the adverse action." *Lawson*, 12 Cal. 5th at 713–14. It would therefore be for Hughes to prove at trial that her complaints about Medina (both the discrimination and labor law complaints) were among the factors that contributed to her termination. Walmart argues she cannot construct this link because she continued working for the company for about a year after she made her complaint. (Doc. 43 at 5.) A jury may very well agree that her reports about Medina had been forgotten by the time she was terminated. Walmart has not, however, demonstrated that this is true beyond any genuine dispute, nor that a year is simply too long as a matter of law. The cases it cites to support

its position use a legal test that no longer applies to claims under 1102.5. (*See id.* (citing *Morgan v. Regents of the Univ. of Cal.*, 88 Cal. App. 4th 52, 69 (2000) and *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 615 (1989))); *see also Lawson*, 12 Cal. 5th at 712–18. Walmart has not demonstrated that it is entitled to summary judgment on this basis.

By statute, if an employee shows a disclosure was a contributing factor to her termination, the employer can avoid liability if it demonstrates by "clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." Cal. Lab. Code § 1102.6. Walmart argues that it would have terminated Hughes regardless of her complaints because she was not fulfilling her responsibilities as a GM Coach. (*See, e.g.*, Doc. 43 at 5–6.) Walmart has not cited the necessary "clear and convincing" evidence. As summarized above, the record is mixed. Some evidence could show Hughes was not performing her job duties, for example by failing to keep her areas clean and to manage the team leaders under her supervision. Other evidence could show that she was forced into an impossible situation, that the company imposed the most severe punishment available, and that it did not discipline others so severely.

Finally, in addition to section 1102.5(b), Hughes also cites subsection (c) in her complaint. (*See* Doc. 36 at 9.) She does not argue in opposition to Walmart's motion, however, that she can prove the company is liable under that subsection, and she cannot. Under subsection (c), employers and others acting on their behalf may not retaliate against employees who refuse "to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Cal. Lab. Code § 1102.5(c). Hughes does not cite evidence that could show she refused to participate in an illegal activity. She did refuse to record false inventory numbers, but as explained above, she has not demonstrated that such a report would have violated any statute, rule, or regulation.

## III. Derivative Claims

In addition to her claims of discrimination and retaliation, Hughes asserts claims for failure to prevent discrimination under the Fair Employment and Housing Act and for discharge in violation of public policy. Hughes's and Walmart's arguments about these claims are

derivative of their arguments about her other claims. (*See* Docs. 40-1 at 27–28; 42 at 28–29; 43 at 11.) Because Walmart is not entitled to summary judgment of the underlying claims, it is not entitled to summary judgment of the derivative claims.

**IV. Punitive Damages**

Walmart argues in the alternative that Hughes cannot obtain punitive damages. (*See* Doc. 40-1 at 28–31.) In a civil case that, like this one, does not arise "from the breach of a contractual obligation, the jury may award punitive damages 'where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.'" *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 712, 219 P.3d 749, 765 (2009) (quoting Cal. Civ. Code, § 3294(a)). Employers are not liable for punitive damages based on an employee's actions unless the employer either (1) "had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others," or (2) "authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(b).

If the defendant is a "corporate employer," like Walmart is, then "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." *Id.* The California Supreme Court has interpreted this language as barring corporate liability for punitive damages unless the employee in question exercised "substantial discretionary authority over decisions that ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 577 (1999). The phrase "discretionary authority over corporate policy" refers to authority over "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." *Roby*, 47 Cal. 4th at 714–15.

Hughes has not cited evidence that could show that any of the individual employees in question had this type of authority, and Walmart has offered uncontroverted evidence that Baeza, Medina, DeGrasse, Herrera, and others involved in her discharge did not have "authority to create and/or change any of Walmart policies or procedures, nor did they have the ability to exercise substantial independent authority." (Doc. 42-2 at 56.) They "have never offered their thoughts

on a 'corporate policy' that affected a substantial portion of Walmart's business, or anything outside of their assigned stores." (*Id.* at 57.) The instead "assisted with the enforcement of policies and procedures put in place by Walmart." (*Id.*) When it came to terminations, their authority "was limited to determining whether the conduct of an associate at Walmart's Porterville store was supported by the proper documentation and whether the conduct actually violated Walmart's policies." (*Id.*) Walmart's motion for summary judgment is thus granted in part with respect to Hughes's request for punitive damages. *See, e.g.*, *Albornoz v. Wal-Mart Assocs., Inc.*, No. 22-01229, 2025 WL 1343185, at *9 (E.D. Cal. May 8, 2025) (granting summary judgment on a punitive damages request against Walmart for the same reasons).

**CONCLUSION**

For the reasons above, the motion for summary judgment (Doc. 40) is **GRANTED IN PART** as to Hughes's request for punitive damages. The motion is otherwise **DENIED**.

**Within 21 days**, the parties **SHALL** file a joint status report describing any impediments to setting the matter for trial, detailing whether they believe a settlement conference would likely be fruitful and proposing three possible trial date—after confirming the Court's availability on these dates with the assigned Courtroom Deputy Clerk.

IT IS SO ORDERED.

Dated: _August 28, 2026_

UNITED STATES DISTRICT JUDGE